IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| KISSINGER FINANCIAL SERVICES, LLC, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: GJH-18-3978 |
| | * | |
| WILLIAM KISSINGER, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiffs Kissinger Financial Services, LLC, its sole member WT Acquisition LLC ("WTA"), and that entity's sole member HighTower Holding, LLC ("HighTower"), bring this business tort action against their former employees, Defendants William Kissinger ("W.K.") and Edward Kissinger ("E.K."), and their current employer, RBC Capital Markets, LLC ("RBC"), alleging that W.K. and E.K. breached employment contracts by leaving for RBC without adequate notice and by taking confidential client information. Plaintiffs' Amended Complaint asserts fourteen claims against Defendants, including a claim under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq.* Defendants have moved to dismiss the Amended Complaint for failure to state a claim and lack of subject matter jurisdiction, or alternatively for a more definite statement under Federal Rule of Civil Procedure 12(e). No hearing is necessary. *See* Loc. Rule 105.6. (D. Md.). For the following reasons, the Court will grant Defendants' motion and dismiss the Amended Complaint without prejudice.

1

**I. BACKGROUND**

According to the Amended Complaint, Defendants W.K. and E.K. were "Executives" employed in the Hunt Valley, Maryland office of Plaintiff Kissinger Financial Services, LLC (abbreviated in the introductory statement of the Amended Complaint as "KFS"), a wealth management and financial services firm.[1] ECF No. 20 ¶¶ 3, 4, 14–15, 37–38. In 2001, 2016, and 2017, W.K. and E.K. signed employment agreements with "KFS" and its predecessors in interest. *Id.* ¶¶ 20–21, 26. The terms of each agreement were substantially similar, if not identical. *Id.* ¶ 31 n.3. The 2017 agreements, which W.K. and E.K. executed on or about February 1, 2017, included several key provisions that Plaintiffs raise here. *Id.* ¶ 26.

First, Section 2(a) of the 2017 agreements permitted W.K. and E.K. to terminate their employment only by providing "KFS" with advance written notice at least 120 days prior to their departure. *Id.* ¶ 33. Section 5 defined the terms "[t]rade [s]ecret" and "[c]onfidential [i]nformation" and barred W.K. and E.K. from using or disclosing either, even after leaving their employment with "KFS." *Id.* ¶ 34. The definitions included "information pertaining to actual and prospective customers, including client lists and data," and "client contact information and e-mail addresses." *Id.* Finally, Section 6 of the 2017 agreement included a non-competition clause barring W.K. and E.K. from joining a business that competes with "KFS" for one year after termination of their employment. *Id.* ¶ 35. Another subsection prohibited W.K. and E.K. from soliciting any client or customer of "KFS" for the same period. *Id.*

On September 22, 2017, W.K. and E.K. each submitted resignation letters to "KFS" announcing that they had been hired by Defendant RBC, a competitor of "KFS." *Id.* ¶ 48.

---

[1] The Court notes the location of the abbreviation, and adds quotation marks when using it in this section, because the Amended Complaint appears to use "KFS" to refer to different entities at different times, which gives rise to the central issue the Court addresses in the discussion below.

According to the Amended Complaint, RBC recruiters had begun engaging W.K. and E.K. earlier in 2017. *Id.* ¶ 47. The Amended Complaint alleges that it was apparent from the plain text of the resignation letters that both W.K. and E.K. misappropriated confidential, proprietary, and trade secret client information with the intent to use it to compete against KFS. *Id.* ¶ 49. Within two days of their resignations, W.K. and E.K. had established a new office and had begun to solicit "KFS" clients or customers. *Id.* ¶ 51.

Since that time, virtually all client accounts formerly serviced by W.K. and E.K. have been transferred away from "KFS." *Id.* These accounts represented over $350 million in assets, more than half of "KFS's" total assets under management, and more than $3.8 million in annual revenue. *Id.* ¶¶ 9–10. The departures of W.K. and E.K. "so severely impacted Baltimore operations that Plaintiffs had no alternative but to close Plaintiffs' Baltimore office." *Id.* ¶ 51. The departures also "completely destroyed the value of KFS" to WTA and HighTower, who had purchased it for approximately $5.7 million as part of a larger transaction. *Id.*

Plaintiffs filed this action on December 27, 2018, ECF No. 1, and filed their Amended Complaint on March 8, 2019, adding a claim of misappropriation of trade secrets under the DTSA. ECF No. 20 ¶¶ 17, 70–78d. The Amended Complaint also asserts a claim for violation of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law §§ 11-1201 *et seq.*, as well as common law claims of breach of contract, unfair competition, breach of the duty of loyalty, tortious interference with contract and with prospective business advantage, conversion, civil conspiracy, and unjust enrichment. *Id.* ¶¶ 52–69b, 79–134b. Plaintiffs seek actual and compensatory damages of $15 million, as well as punitive damages. *Id.* at 37.[2] On April 5, 2019, Defendants filed a Motion to Dismiss the Amended Complaint under Federal Rules of Civil

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Procedure 12(b)(1) and 12(b)(6), or in the alternative, for a more definite statement pursuant to Rule 12(e). ECF No. 23. Plaintiffs filed an Opposition on May 3, 2019, ECF No. 31, and Defendants filed a Reply on May 17, ECF No. 35.

## II. STANDARD OF REVIEW

"A district court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)). "The burden of establishing subject matter jurisdiction rests with the plaintiff." *Demetres v. East West Constr.*, 776 F.3d 271, 272 (4th Cir. 2015). "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific" inquiry, drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*,

4

550 U.S. at 570). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

Under Rule 12(e), "a party 'may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response.'" *Garner v. Stoney River Legendary Steaks*, No. DKC 14-1574, 2015 WL 570419, at *1 (D. Md. Feb. 10, 2015) (quoting Fed. R. Civ. P. 12(e)). "Thus, '[w]here a party has enough information to frame an adequate answer, a court should deny the Rule 12(e) motion and avoid delay in maturing the case.'" *Streeter v. SSOE Sys.*, No. WMN-09-CV-01022, 2009 WL 3211019, at *10 (D. Md. Sept. 29, 2009) (alteration in original) (quoting *Doe v. Bayer Corp.*, 367 F. Supp. 2d 904, 917 (M.D.N.C. 2005)). Rule 12(e) motions "are 'designed to strike at unintelligibility rather than simple want of detail.'" *Garner*, 2015 WL 570419, at *1 (quoting *Seneca One Fin., Inc. v. Structured Asset Funding, LLC*, No. DKC 10-1704, 2010 WL 4449444, at *2 (D. Md. Nov. 4, 2010)).

## III. DISCUSSION

Defendants make two primary arguments: that Plaintiffs have insufficiently pleaded their DTSA claim, which if dismissed would leave only state law claims over which Defendants argue the Court should not exercise supplemental jurisdiction; and that ambiguities in the Amended

5

Complaint undermine the plausibility of Plaintiffs' alleged right to enforce a protectable interest against Defendants. Defendants alternatively request an order to Plaintiffs to provide a more definite statement to clarify those ambiguities. ECF No. 23. The Court finds the second argument persuasive and will dismiss the Amended Complaint without prejudice so that Plaintiffs may remedy the fatal issues in the existing pleading.

The Amended Complaint's core deficiency is that it appears to use the abbreviation "KFS" to refer not only to Plaintiff Kissinger Financial Services, LLC, but also to multiple other entities, none of which are described with clarity. ECF No. 20 at 1. Demonstrating the fundamental uncertainty this creates requires restating allegations in the pleading at some length. To begin, the Amended Complaint alleges that in April 2001, financial services firm Sanders Morris Harris Group, Inc. ("SMHG") acquired an entity called "KFS" in a transaction that allowed that entity to "retain[] its name" and become a "wholly owned subsidiary of SMHG." *Id.* ¶ 19. W.K. and E.K. signed employment agreements "with KFS" on April 5, 2001. *Id.* ¶ 20. Fifteen years later, "[o]n or about April 15, 2016, W.K. and E.K. each executed a new employment agreement with Sanders Morris Harris, LLC ("SMH") d/b/a KFS," which is also "a wholly owned subsidiary of SMHG." *Id.* ¶ 21 & n.2. Together, these allegations appear to describe two "KFS" entities – a wholly owned subsidiary of SMHG, *id.* ¶ 19; and SMH, also a wholly owned subsidiary of SMHG that was doing business as "KFS" in 2016, *id.* ¶ 21 & n.2.

While a possible reading of these allegations is that these two entities are one and the same, and that at some point the "KFS" entity that SMHG purchased in April 2001 became SMH, other allegations preclude that inference. The Amended Complaint asserts that in or about September 2016, "SMH and KFS executed a key agreement that transferred all of the client accounts and material contracts belonging to SMH to KFS." *Id.* ¶ 23. The Amended Complaint

6

quotes from the agreement, which it calls the "Definitive Agreement," including a passage stating that SMH as "Seller" intended to transfer, and "KFS" as "Buyer" intended to acquire, the assets of the business of "Buyer's current division commonly known as Kissinger Financial Services" in Cockeysville, Maryland. *Id.* In other words, SMH – which Plaintiffs allege was doing business as "KFS" in April 2016, five months before the Definitive Agreement, *id.* ¶ 21 – executed an agreement to transfer, to an apparently distinct "KFS" entity, the assets of that entity's own Maryland "division" known as "Kissinger Financial Services," *id.* ¶ 23.

Also among the assets "being transferred to KFS" under the Definitive Agreement was a set of contracts, "most notably the 2016 KFS Employment Agreement(s)" that W.K. and E.K. had signed with SMH "d/b/a KFS" in April 2016. *Id.* ¶¶ 21, 25. The Amended Complaint then states that on February 1, 2017, W.K. and E.K. executed, "with KFS," their 2017 employment agreements, as described previously. *Id.* ¶ 26. Next, Plaintiffs allege that in or about July 2017, Plaintiff WTA "acquired KFS pursuant to an asset purchase transaction" and subsequently "became the sole member of KFS." *Id.* ¶ 29. As a result of the transaction, conducted pursuant to an agreement referred to as the "WT Purchase Agreement," "the obligations contained in the 2017 KFS Employment Agreement(s) and all prior agreements and all of the rights thereunder *were assigned to KFS*." *Id.* (emphasis added). Because the Amended Complaint alleges that W.K. and E.K. had executed the 2017 agreements "with KFS," it is unclear to which "KFS" entity they could be "assigned" by the WT Purchase Agreement. *Id.* ¶ 30.

Notably, the Amended Complaint also asserts that this manner of "assign[ment]" "was the case when SMHG acquired KFS in April 2001 and any other acquisitions of KFS by other entities between 2001 and July, 2017, including Affiliated Wealth Partners Holdings, LLC and/or Summer Wealth Management, LLC (the 'Sellers' pursuant to the WT Purchase

7

Agreement)." *Id.* ¶ 29. Further references to those "Seller" entities appear in quoted passages from the WT Purchase Agreement. *Id.* ¶¶ 40–41. The passages specifically describe WTA's acquisition of assets from "AWPH Seller," which a footnote states is "Affiliated Wealth Partners Holdings, LLC," and from "SWM Seller," defined in a footnote as "Summer Wealth Management, LLC." *Id.* ¶ 40 & nn. 5, 7. WTA acquired from "AWPH Seller" "the WT Securities," defined as "100% of the outstanding limited liability company interests of WealthTrust," and acquired from "SWM Seller" the "SWM Purchased Securities," defined as the "Kissinger Interests, Leonetti Interests, and Rikoon Interests." *Id.* ¶ 40 & nn. 6, 8–9; *see also id.* ¶ 41 (quoting a section of the agreement stating that "AWPH Seller owns all of the WT Purchased Securities and the SWM Seller owns all of the SWM Purchased Securities"). The Amended Complaint does not further explain any of these terms or entities or describe their connection to any of "KFS" entity.

After review of these allegations, it is clear to the Court that the Amended Complaint uses "KFS" to refer to several different entities, thereby creating contradictions that the Court is unable to reconcile, even construing the allegations in Plaintiffs' favor. To be sure, inferences can be drawn to align a subset of the allegations into a consistent narrative. Perhaps the clearest path is to look to the quoted passages of the WT Purchase Agreement and the surrounding allegations, which suggest that either Affiliated Wealth Partners Holdings, LLC or Summer Wealth Management, LLC owned the KFS entity with which W.K. and E.K. signed their agreements on February 1, 2017. ECF No. 20 ¶¶ 29, 40–41 & nn. 5–9. But there are no allegations as to whether that KFS entity was Plaintiff "Kissinger Financial Services, LLC," a name the Amended Complaint does not use again after its introductory statement. Nor does the Amended Complaint explain how Affiliated Wealth Partners Holdings, LLC and Summer

8

Wealth Management, LLC relate to SMH, which was allegedly doing business as "KFS" less than a year before the 2017 employment agreements were signed. *Id.* ¶ 21.

Compounding the confusion is the allegation that under the WT Purchase Agreement, the obligations in the 2017 agreements "were assigned *to KFS.*" *Id.* ¶ 29 (emphasis added). Which "KFS" entity is the alleged assignee is unclear. If Plaintiff Kissinger Financial Services, LLC was already a party to those agreements, there would presumably be no need for an assignment. If the Plaintiff KFS entity was assigned the agreements, however, it is entirely unclear with which "KFS" entity W.K. and E.K. would have signed the 2017 agreements, given the lack of allegations describing or differentiating the SMH KSF entity and the entity transferred under the WT Purchase Agreement. The Court also cannot discount the possibility that the Amended Complaint attempts to allege an assignment from an entity to itself, given the additional allegation that in the 2016 Definitive Agreement between "SMH and KFS," SMH transferred to "KFS" that entity's own "division" in Cockeysville, Maryland. *Id.* ¶ 23.

In light of this tangled web of allegations about entities that have transferred "KFS" over a sixteen-year period, the Court is compelled to agree with Defendants that the Amended Complaint is simply too internally contradictory to determine which "KFS" entity was the alleged original party to the 2017 employment agreements. Importantly, though Defendants raise these issues in detail in their Motion, Plaintiffs' Opposition entirely fails to address them. Instead, Plaintiffs simply reiterate the pleading's basic narrative, describing the "acquisition of KFS via the WT Agreement" and noting that W.K. and E.K. "had each previously signed employment contracts with KFS," without explaining which KFS entity these assertions refer to. ECF No. 31 at 16. Plaintiffs make almost no acknowledgment of the issues Defendants raise and do not clarify any of the ambiguities that Defendants have highlighted.

Faced with the Amended Complaint's contradictory and vague descriptions of the critical facts at issue, and having gained no clarity from Plaintiff's briefing, the Court concludes that the Amended Complaint fails to state a claim and therefore must be dismissed under Rule 12(b)(6). All of Plaintiffs' claims flow directly or indirectly from the alleged obligations in the 2017 employment agreements, and because Plaintiffs fail to adequately plead their entitlement to enforce those obligations, the Amended Complaint cannot proceed. To be clear, the Court is aware that complex asset transfers among networks of corporate entities are common if not the norm in various industries, including perhaps in financial services. But parties seeking to enforce the rights of such entities must offer plausible allegations that concisely and plainly describe those rights and the parties who hold them if they wish to obtain relief in court. By using "KFS" in an imprecise and contradictory manner, Plaintiffs here have failed to meet that baseline requirement. Accordingly, the Amended Complaint will be dismissed.[3]

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 23, is granted. Plaintiffs' claims are dismissed without prejudice. Plaintiffs may file a second Amended Complaint to remedy the issues with the Amended Complaint within 21 days. A separate Order shall issue.

Date: <u>March   6, 2020</u>                                      /s/_____
                                                                                    GEORGE J. HAZEL
                                                                                    United States District Judge

---

[3] The Court finds that dismissal without prejudice is warranted, rather than an order directing Plaintiffs to file a more definite statement under Rule 12(e). The Amended Complaint is not unintelligible, given that the general contours of the events it sets out – RBC's alleged poaching of W.K. and E.K. from "KFS" – are relatively straightforward. Instead, the Amended Complaint simply fails to state a claim because allegations purporting to establish the contract rights at issue are contradictory and ambiguous, undermining the plausibility of Plaintiffs' claims. *See Seneca One Fin.*, 2010 WL 4449444, at *2.