IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|   |   |   |
|---|---|---|
| **KISSINGER FINANCIAL SERVICES, LLC,** *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| v. | | Case No.: GJH-18-3978 |
| | * | |
| **WILLIAM KISSINGER,** *et al.*, | | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Kissinger Financial Services, LLC, its sole member WT Acquisition LLC ("WTA"), and that entity's sole member HighTower Holding, LLC ("HighTower"), brought this business tort action against their former employees, Defendants William Kissinger ("W.K.")[1] and Edward Kissinger ("E.K.") (collectively, the "Kissingers"), and E.K's current employer, RBC Capital Markets, LLC ("RBC"), alleging that W.K. and E.K. breached employment contracts by leaving for RBC without adequate notice and by taking confidential client information. ECF No. 46. Plaintiffs' Second Amended Complaint—filed after the Court dismissed their First Amended Complaint, ECF Nos. 42, 43—asserts fourteen claims against Defendants, including a claim under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq*. ECF No. 46. Pending before the Court is Defendants' Motion to Dismiss

---

[1] Defendant W.K. has passed away since the filing of the instant motion. ECF No. 55. Consequently, the Court notes that, pursuant to Fed. R. Civ. P. 25(a)(1), the parties have 90 days from the Notice of Death, ECF No. 55, which was filed on January 22, 2021, to file a motion for substitution, or the Court will dismiss this action as to W.K. *See* Fed. R. Civ. P. 25(a)(1) ("If a party dies and the claim is not extinguished, . . . [a] motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.").

Plaintiffs' Second Amended Complaint.[2] ECF No. 51. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Defendant's Motion to Dismiss is denied.

I.   **BACKGROUND**

    A.   **Factual Background**[3]

        i.   **The Corporate History of Defendant Kissinger Financial Services, LLC**

In April 2001, Pinnacle Global Group, Inc. ("Pinnacle") purchased Kissinger Financial Services, Inc., which included Kissinger Financial Services (the "Kissinger Business"), from W.K. and E.K. ECF No. 46 ¶ 18. Kissinger Financial Services, Inc. retained its name and became a wholly-owned subsidiary of Pinnacle. *Id.* In May 2001, Pinnacle changed its name to Sanders Morris Harris Group, Inc. ("SMHG"), after which Kissinger Financial Services, Inc., including the Kissinger Business, was a wholly-owned subsidiary of SMHG. *Id.* ¶ 20.

Fourteen years later, in September 2015, Sanders Morris Harris, LLC ("SMH"), a wholly-owned subsidiary of SMHG, was formed,[4] and the following year, in June 2016, Plaintiff Kissinger Financial Services, LLC was formed. *Id.* ¶¶ 21, 23. The Second Amended Complaint does not expressly explain who the members of Plaintiff Kissinger Financial Services, LLC were at this time, although it is reasonably clear that Plaintiff Kissinger Financial Services, LLC was an affiliate of SMH. *See id.* ¶ 28.

---

[2] Also pending before the Court is a Stipulation to Extend Defendants' Time to Respond to Plaintiffs' Second Amended Complaint, docketed as a Motion for Extension of Time to File. ECF No. 50. The Court grants this motion. Additionally, the Court approves the Parties' Stipulation to Extend Defendants' Time to Respond to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, ECF No. 53, filed by Defendants.
[3] Unless otherwise stated, the background facts are taken from Plaintiff's Second Amended Complaint, ECF No. 46, and are presumed to be true.
[4] The Court notes that the Second Amended Complaint alleges that another entity named Sanders Morris Harris was created in October 1999 as the result of a merger. ECF No. 46 at 7 n.2. This entity was a wholly-owned subsidiary of Pinnacle. *Id.* It is unclear to the Court what relationship this entity has to SMH. *Id.*

In September 2016, SMH and Plaintiff Kissinger Financial Services, LLC executed the Definitive Agreement that transferred all of the client accounts and material contracts belonging to SMH to Plaintiff Kissinger Financial Services, LLC.[5] *Id.* ¶ 23. The Second Amended Complaint quotes language from this agreement stating that SMH, as the seller, intended to transfer, and Plaintiff Kissinger Financial Services, LLC, as the buyer, intended to acquire "all of the assets, liabilities, and obligations to the extent each are located at or generated by the business of Buyer's current division commonly known as Kissinger Financial Services." *Id.* (emphasis omitted). Additionally, the Second Amended Complaint, through quotes pulled from Section 2 of the Definitive Agreement, describes the assets purchased via the Definitive Agreement as "all of the assets employed by Seller exclusively in the Kissinger Business[,]" excluding "any assets of Buyer that are not used exclusively in the operation of the Kissinger Business" and "any assets of Buyer that are used partially in the operation of the Kissinger Business but also in the operation of other divisions of Buyer's operations[.]" *Id.* ¶ 24 (emphasis omitted).

Sometime prior to February 2017, Summer Wealth Management, LLC ("SWM")—a direct subsidiary of Affiliated Wealth Partners Holdings LLC ("AWPH"), *id.* at 16 n.10[6]— "acquired SMH and all of its affiliates," including Plaintiff Kissinger Financial Services, LLC and the "KFS Business." *Id.* ¶ 28. Then, in February 2017, SWM entered into a Purchase and Sales Agreement with Tectonic Holdings LLC ("Tectonic") to sell 100% of SMH to Tectonic, except for certain entities including the "Kissinger Division[,]" which the Second Amended

---

[5] Plaintiffs allege that the assets transferred from SMH to Plaintiff Kissinger Financial Services, LLC include the Kissinger Business. *Id.* ¶ 24. However, it is unclear how the Kissinger Business went from being an asset/operation of Kissinger Financial Services, Inc., a wholly-owned subsidiary of SMHG, to an asset/operation of SMH, another wholly-owned subsidiary of SMHG. This gap in the allegations is discussed below. *See infra* § III.A.
[6] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Complaint describes as including Plaintiff Kissinger Financial Services, LLC and the "KFS Business[.]"[7] *Id.* The Agreement referenced a "Kissinger Spinout[,]" which the Second Amended Complaint defines as "the transfer, sale and assignment of the Kissinger Division to [Plaintiff Kissinger Financial Services, LLC.]" *Id.* ¶¶ 28, 29. The Second Amended Complaint then further explains that, as relevant to this case, Plaintiff Kissinger Financial Services, LLC, "and its affiliates, including the Kissinger Business, were 'spun off' from SMH and retained by SWM under its umbrella of entities." *Id.* ¶ 30.

Finally, in July 2017, Plaintiff WTA acquired Plaintiff Kissinger Financial Services, LLC from AWPH and SWM and became the sole member of Plaintiff Kissinger Financial Services, LLC. *Id.* ¶¶ 28, 30.

### ii.   The Kissingers' Employment Contracts

According to the Second Amended Complaint, in 2017, Defendants W.K. and E.K. were "Executives" employed in the Hunt Valley, Maryland office of Plaintiff Kissinger Financial Services, LLC, the wealth management and financial services firm whose corporate history is described above. ECF No. 46 ¶¶ 4, 14, 38–39. In 2001, 2016, and 2017, W.K. and E.K. signed employment agreements with Plaintiff Kissinger Financial Services, LLC (2017 agreements) and its alleged predecessors in interest, Kissinger Financial Services, Inc. (2001 agreements) and SMH (2016 agreements). *Id.* ¶¶ 19, 21, 26. The terms of these employment agreements were substantially similar. *Id.* The 2017 agreements, which W.K. and E.K. executed on or about February 1, 2017, include several key provisions that Plaintiffs raise here. *Id.* ¶ 26.

---

[7] The "KFS Business" is defined by the Tectonic Agreement as "all assets and operations of SMH located in the State of Maryland" and all revenues generated by W.K. and E.K. and their subordinates, and thus is seemingly synonymous with the Kissinger Business. ECF No. 46 ¶ 29.

Section 2(a) of the 2017 agreements permitted W.K. and E.K. to terminate their employment only "by providing [Plaintiff] KFS with one hundred twenty (120) days prior written notice[.]" *Id.* ¶ 34. Section 5 defined the terms "Trade Secret" and "Confidential Information" and barred W.K. and E.K. from the unauthorized use or disclosure of either, even after leaving their employment with Plaintiff Kissinger Financial Services, LLC. *Id.* ¶ 35. The definitions included "information pertaining to actual and prospective customers, including client lists and data," and "client contact information and e-mail addresses." *Id.* Finally, Section 6 of the 2017 agreements included a non-competition clause barring W.K. and E.K. from joining a business that competes with Plaintiff Kissinger Financial Services, LLC for one year after termination of their employment. *Id.* ¶ 36. Another subsection of Section 6 prohibited W.K. and E.K. from soliciting any client or customer of Plaintiff Kissinger Financial Services, LLC for the same period. *Id.*

### iii.  Defendants' Alleged Misconduct

On September 22, 2017, W.K. and E.K. each submitted resignation letters to Plaintiff Kissinger Financial Services, LLC announcing that they had been hired by Defendant RBC, a competitor of Kissinger Financial Services, LLC. *Id.* ¶¶ 49–50. Plaintiffs allege in the Second Amended Complaint that RBC recruiters had begun engaging W.K. and E.K. earlier in 2017 "with the intent of luring them to join RBC as financial advisors[,]" taking advantage of the rumors that a sale of HighTower was imminent. *Id.* ¶ 48. According to Plaintiffs, it was apparent from the plain text of the resignation letters that "both W.K. and E.K. misappropriated confidential, proprietary, and trade secret client information and absconded to a competitor with the intention of using said information and trade secrets to directly compete against Plaintiffs." *Id.* ¶ 50. Plaintiffs also allege that within two days of their resignations, W.K. and E.K. "had

already established a new office environment and were working through the weekend to solicit as many [Plaintiff] KFS clients or customers as they could." *Id.* ¶ 52.

Since the Kissingers' resignation, virtually all client accounts formerly serviced by W.K. and E.K. have been transferred away from Plaintiff Kissinger Financial Services, LLC. *Id.* These accounts represented over $350 million in assets, more than half of Kissinger Financial Services, LLC's assets under management, and more than $3.8 million in annual revenue. *Id.* ¶¶ 9–10. The Kissingers' departure "so severely impacted Baltimore operations that Plaintiffs had no alternative but to close Plaintiffs' Baltimore office[.]" *Id.* ¶ 52. W.K. and E.K.'s departure also "completely destroyed" the value of Kissinger Financial Services, LLC to WTA and HighTower, who had purchased it for approximately $5.7 million as part of a larger transaction. *Id.* ¶ 10.

B. **Procedural History**

Plaintiffs originally filed this action on December 27, 2018, ECF No. 1, and filed their First Amended Complaint on March 8, 2019, adding a claim for misappropriation of trade secrets under the DTSA, ECF No. 20 ¶¶ 17, 70-78. The First Amended Complaint also asserted a claim for violation of the Maryland Uniform Trade Secrets Act, Md. Code. Ann., Com. Law §§ 11-1201 *et seq.*, as well as common law claims of breach of contract, unfair competition, breach of the duty of loyalty, tortious interference with contract, tortious interference with prospective business advantage, conversion, civil conspiracy, and unjust enrichment. *Id.* ¶¶ 52–69, 79–134. Plaintiff sought actual and compensatory damages of $15 million, as well as punitive damages. *Id.* at 37.

On April 5, 2019, Defendants filed a Motion to Dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), or in the alternative, for a more definitive statement pursuant to Rule 12(e). ECF No. 23. In a Memorandum Opinion and Order issued March 6,

2020, the Court granted Defendants' motion, finding "that the Amended Complaint use[d] 'KFS' to refer to several different entities, thereby creating contradictions that the Court is unable to reconcile, even construing the allegations in Plaintiff's favor." ECF No. 42 at 8; ECF No. 43. Specifically, "[f]aced with the Amended Complaint's contradictory and vague descriptions of the critical facts at issue, and having gained no clarity from Plaintiff's briefing, the Court conclude[d] that the Amended Complaint fail[ed] to state a claim and therefore must be dismissed under Rule 12(b)(6)." ECF No. 42 at 10. The Court ordered Plaintiffs to file a Second Amended Complaint, or a notice indicating that they do not wish to proceed with the action, within 21 days of the Order. ECF No. 43.

The Plaintiffs complied with the Order, filing the Second Amended Complaint on June 19, 2020. ECF No. 46. The Second Amended Complaint includes the same claims and request for damages but attempts to clarify the corporate history of Plaintiff Kissinger Financial Services, LLC and what rights Plaintiffs hold with regard to the Kissinger employment agreements and the client accounts serviced by W.K. and E.K. *Id.* ¶¶ 18–31. On August 5, 2020, Defendants filed the instant Motion to Dismiss, arguing that Plaintiffs' claim did not address the Court's concerns as outlined in its March 6, 2020 opinion and that the Court should dismiss the action with prejudice under Fed. R. Civ. P. 12(b)(6). ECF No. 51. Plaintiffs responded in opposition on August 19, 2020, ECF No. 52, and Defendants replied on September 9, 2020, ECF No. 54.

## II.  STANDARD OF REVIEW

To state a claim that survives a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

7

570 (2007)). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific" inquiry, drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*, 550 U.S. at 570). The Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court must "draw all reasonable inferences in favor of the plaintiff." *Id.* at 253 (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "[B]ut [the Court] need not accept the legal conclusions drawn from the facts, and . . . need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Id.* (first alteration in original) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

"In general, a court 'is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 332 (D. Md. 2012). However, the "Court 'may properly take judicial notice of matters of public record . . . [and] consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Kaswell v. Wells Fargo Bank, N.A.*, No. RDB-13-1315, 2014 3889183, at *1 n.1 (D. Md. Aug. 6, 2014) (alterations in original) (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

**III.   DISCUSSION**

Defendants make three arguments in their Motion to Dismiss: (1) ambiguities in the Second Amended Complaint undermine the plausibility of Plaintiffs' alleged right to enforce a protectable interest against Defendants; (2) Plaintiffs have insufficiently pled their DTSA claim, which if dismissed would leave only state law claims over which Defendants argue the Court should not exercise supplemental jurisdiction; and (3) Plaintiffs' claims based on the 2001 and 2016 employment agreements are too conclusory to state a claim. ECF No. 51 at 8–19. If the Court agrees with either of the first two arguments, the action will be dismissed in its entirety. In contrast, the third argument would only affect the claims in so far as they are based on the 2001 and 2016 employment agreements. The Court will address each argument below.

**A.   Plausibility of Plaintiffs' Alleged Right to Enforce a Protectable Interest against Defendants**

This Court previously admonished Plaintiffs for the confusion created in the First Amended Complaint by the contradictory use of the abbreviation "KFS" to refer to numerous different entities. ECF No. 42 at 8–10. This confusion prevented the Court from concluding that the Plaintiffs had plausibly pled their entitlement to enforce a protectable interest against Defendants. *Id.* at 10. Although the section of the Second Amended Complaint addressing Plaintiff Kissinger Financial Services, LLC's corporate history and Plaintiffs' entitlement to enforce the rights at issue here, ECF No. 46 ¶¶ 18–31, is still not a model of clarity, under the standard of review for a motion to dismiss, Plaintiffs have now sufficiently addressed the Court's concerns.

Defendants raise a number of concerns with Plaintiffs pleading in the Second Amended Complaint. The overall thrust of their argument, however, is that Plaintiffs have not plausibly alleged that Plaintiffs "ever held any rights to the 2001 Employment Agreements or the customer

9

accounts that Plaintiffs baldly allege were interfered with by the Kissingers." ECF No. 51 at 10. In support of this argument, Defendants first point to Plaintiffs failure to explain whether and how the Kissinger Business and the 2001 employment agreement between the Kissingers and Kissinger Financial Services, Inc. were transferred from one wholly-owned SMHG subsidiary (Kissinger Financial Services, Inc.) to another wholly-owned SMHG subsidiary (SMH). *Id.* at 11. Defendants are correct that there is a gap in Plaintiffs' allegations; however, the Court must make all reasonably inferences in Plaintiffs' favor, *Nemet Chevrolet, Ltd.*, 591 F.3d at 253, and detailed factual allegations are unnecessary at the pleading stage, *McCaffrey v. Chapman*, 921 F.3d 159, 163 (4th Cir. 2019) (citing *Iqbal*, 556 U.S. at 678). It is reasonable to infer that such a transfer was made through one or more transactions that took place sometime during the fifteen year period between 2001, when the Kissingers sold their business (Kissinger Financial Services, Inc.) to Pinnacle, ECF No. 46 ¶ 18, and 2016, when SMH allegedly transferred the Kissinger Business and the related employment agreements to Plaintiff Kissinger Financial Services, LLC, *id.* ¶ 23. This inference is supported by the 2016 employment agreements, which according to the Second Amended Complaint "were between 'Sanders Morris Harris LLC, a Texas limited liability company dba Kissinger Financial Services [(the "Kissinger Business")] and W.K. [and E.K.],' respectively[,]" *id.* at 8 n.3 (alterations in original), implying that the Kissinger advisory business, and its associated contracts and customers, was part of SMH at the time the agreement was signed. ECF No. 46 ¶ 22.

Next, Defendants argue that the allegations regarding the transfer of the Kissinger Business, and its associated contracts and customers, from SMH to Plaintiff Kissinger Financial Services, LLC are contradictory and fail to adequately allege that Plaintiff Kissinger Financial Services, LLC ever held "any right to [the] Kissingers' securities business." ECF No. 51 at 11.

10

Plaintiffs' Second Amended Complaint is not devoid of confusion, but ultimately the remaining confusion is not fatal to Plaintiffs' action. Plaintiff alleges that "SMH and [Plaintiff Kissinger Financial Services, LLC] executed an agreement ('the Definitive Agreement') that transferred all of the client accounts and material contracts belonging to SMH [dba Kissinger Financial Services], including but not limited to the 2016 Employment Agreements, to [Plaintiff Kissinger Financial Services, LLC.]" ECF No. 46 ¶ 23. This transfer included "all of the assets employed by Seller [SMH] exclusively in the Kissinger Business[.]" *Id.* ¶ 24 (emphasis omitted). Other excerpts from the Definitive Agreement—provided by Plaintiffs without context—do add confusion by describing Plaintiff Kissinger Financial Services, LLC's intent to "purchase, acquire and/or assume, substantially all of the assets liabilities, and obligations to the extent each are located at or generated by the business of *Buyer's current division* commonly known as Kissinger Financial Services." *Id.* ¶ 23 (bolding omitted and emphasis added). However, the Court finds that these excerpts—which the Court must read without the benefit of viewing the entirety of the Definitive Agreement or understanding the corporate structure of Kissinger Financial Services, LLC—are insufficient to defeat the plausibility of Plaintiffs' claim that the Kissinger Business, including its associated contracts and customers, was transferred from SMH to Plaintiff Kissinger Financial Services, LLC through the Definitive Agreement. *See Whiting-Turner Contracting Co.*, 912 F. Supp. 2d at 332 (finding that the motion to dismiss stage is not the appropriate time for the Court to resolve factual disputes). Defendants are free, however, to challenge the effectiveness of the transfer at a later stage of this litigation.[8]

---

[8] Defendants further support their argument by asking the Court to consider the Kissingers' publically available SEC and FINRA registrations, which allegedly conflict with the allegations Plaintiffs present in their Second Amended Complaint. ECF No. 51 at 11. However, the Court is "mindful that judicial notice must not 'be used as an expedient of courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of litigants to present evidence on disputed matters.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 511 (4th Cir. 2015) (quoting *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local*, 728 F.3d 354, 360 (4th Cir. 2013)). Defendants ask the Court to find that Plaintiffs' allegations regarding the corporate history of Plaintiff

11

Finally, Defendants argue that the "Kissinger Spinout" described in the Second Amended Complaint weighs against the plausibility of Plaintiffs' claim that Plaintiff Kissinger Financial Services, LLC owned the right to enforce a protectable interest against Defendants. ECF No. 51 at 12; ECF No. 54 at 4–5. The Second Amended Complaint describes the "Kissinger Spinout" in two different ways: (1) "'Kissinger Spinout' means the transfer, sale and assignment of the Kissinger Division to [Plaintiff Kissinger Financial Services, LLC,]" ECF No. 46 ¶ 29; and (2) "[Plaintiff Kissinger Financial Services, LLC] and its affiliates, including the Kissinger Business, were 'spun off' from SMH and retained by SWM under its umbrella of entities[,]" *id.* ¶ 30. To better understand these descriptions, it is necessary to review the context in which this particular transaction was being made.

According to the Second Amended Complaint, sometime prior to February 2017, "SWM acquired SMH and all of its affiliates," including Plaintiff Kissinger Financial Services, LLC and the customer accounts and employment agreements associated therewith. *Id.* ¶ 28. SWM then sold SMH to Tectonic except for the "Kissinger Division[,]" defined as "(i) all assets and operations of SMH located in the State of Maryland, and (ii) all Revenues generated by [E.K. and W.K.] and their subordinates." *Id.* ¶¶ 28–29. It is a reasonable inference that the "spin out"

---

Kissinger Financial Services, LLC and the transfer of the Kissinger Business from that entity to SMH are not plausible because the publically available SEC and FINRA registrations attached to their motion show the Kissingers' "registrations with 'Sanders Morris Harris LLC' dating back to 2001—some 14 years prior to the SAC's allegation of SMH, LLC's formation in 2015" and show no registrations with Plaintiff Kissinger Financial Services, LLC. ECF No. 51 at 11. However, these documents do not directly speak to the question at issue here—the effectiveness of SMH's transfer of the Kissinger Business to Plaintiff Kissinger Financial Services, LLC—rather Defendants are asking the Court to adopt their interpretation of the SEC and FINRA registrations. The Court declines to do so. *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 216 (4th Cir. 2009) ("[Defendant] actually seeks notice of its own interpretation of the contents of those documents. The parties clearly and reasonably disagree about the meaning to be ascribed to these . . . documents, and we therefore decline to judicially notice them."). It "is not mandatory that the court consider public records in deciding a motion to dismiss and the court may use its discretion in taking judicial notice of public records." *Helfand v. W.P.I.P., Inc.*, 165 F. Supp. 3d 392, 397 n.6 (D. Md. 2016) (quoting *Groff v. JPMorgan Chase Bank, N.A.*, No. 11-00329-8-RDD, 2011 WL 6140744, at *2 (Bankr. E.D.N.C. Dec. 9, 2011)). Thus, the Court will not take judicial notice of the SEC and FINRA documents attached to Defendants' Motion to Dismiss at this stage of the instant action.

described in the Second Amended Complaint was necessary to achieve the separation of the Kissinger Division from SMH. This necessity could be explained in two ways: (1) as Defendants contend, the Definitive Agreement did not effectively transfer all of the assets associated with the Kissinger's advisory business from SMH to Plaintiff Kissinger Financial Services, LLC, resulting in the need for a second transfer; or (2) Plaintiff Kissinger Financial Services, LLC, was a subsidiary of SMH, and as such, to separate the two entities for the sale of SMH, a spin off was necessary. The second explanation is both reasonable—it does not contradict any of Plaintiffs' other allegations—and in Plaintiffs' favor, thus, since the Court must draw reasonable inferences in the Plaintiffs favor when considering a motion to dismiss, that is the inference this Court adopts for the purposes of this motion.[9]

Therefore, after viewing "all well-pled facts as true and constru[ing] these facts in the light most favorable to the plaintiff" and "drawing all reasonable inferences in favor of the plaintiff[,]" *Nemet Chevrolet, Ltd.*, 591 F.3d at 253, 255, the Court finds that Plaintiffs have plausibly alleged that they own the right to enforce the protectable interests at issue in this case against Defendants.

### B. Sufficiency of Plaintiffs' Allegations Regarding the DTSA Claim

To prevail on a misappropriation claim under the DTSA, a plaintiff must allege: (1) it owns a trade secret which was subject to reasonable measures of secrecy; (2) the trade secret was misappropriated by improper means; and (3) the trade secret implicates interstate or foreign commerce. *Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *7 (D. Md.

---

[9] Defendants also argue that "regulatory approval was necessary to consummate the Kissinger Spinout" and Plaintiffs never allege such approval was received. ECF No. 54 at 5. However, a complaint is not required to set forth "detailed factual allegations." *McCaffrey*, 921 F.3d at 163 (quoting *Iqbal*, 556 U.S. at 678). The Court reasonably infers that such approval occurred. This inference is supported by the uncontested factual allegation that WTA acquired Plaintiff Kissinger Financial Services, LLC from SWM in July 2017, which implies the spin off was completed.

Sept. 9, 2020); *see* 18 U.S.C. § 1836(b)(1). At this stage of the instant litigation, the parties' dispute is limited to the first pleading requirement. Specifically, Defendants urge the Court to dismiss Plaintiffs' DTSA claim because Plaintiffs fail to allege that the information misappropriated by Defendants is a trade secret as defined by the DTSA. ECF No. 51 at 16.

Under the DTSA, a trade secret includes all forms and types of financial, business, or economic information if (1) the owner has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to another person in the relevant industry, and not being readily ascertainable through proper means. 18 U.S.C. § 1839(3). As discussed above, Defendants argue first that Plaintiffs are not the "owners" of the information allegedly misappropriated by Defendants. *See supra* § III.A. The Court rejected this argument above, holding that, under the standard of review for Fed. R. Civ. P 12(b)(6) motions, Plaintiffs have now adequately pled that they own the right to enforce the protectable interest at issue—*i.e.*, they own the information alleged to be a trade secret here. *See supra* § III.A. Defendants, however, also argue that Plaintiffs "fail to allege facts that [support Plaintiffs' allegation that] the purported trade secrets derive independent economic value from their secrecy and are not generally known or readily ascertainable." ECF No. 51 at 17.

In the Second Amended Complaint, Plaintiffs claim that the information Defendants misappropriated included "client lists, client contact and financial information, and other confidential and/or proprietary information[.]" ECF No. 46 ¶¶ 72–73. The Court reasonably infers the last category includes "trade secret information about [Plaintiff Kissinger Financial Services, LLC's] business, including the fees charged and revenues received[,]" to which the Kissingers allegedly had access. *Id.* ¶ 35. Plaintiffs contend that these trade secrets "derive

independent economic value, actual or potential, from not being generally known to and/or readily ascertainable through proper means by other persons who could obtain economic value from the disclosure or use of such information." *Id.* ¶ 74. Supporting this claim, Plaintiffs allege some of this information was purchased by Plaintiffs' predecessors in interest as part of the 2001 purchase of Kissinger Financial Services, Inc.,[10] and that the remainder was developed by Plaintiffs and Plaintiffs' predecessors in interest over the sixteen years that E.K. and W.K. were employed by Plaintiffs and Plaintiffs' predecessors in interest. *Id.* ¶ 35. Most recently, Plaintiffs WTA and HighTower expended significant resources to obtain these trade secrets as part of the acquisition of Plaintiff Kissinger Financial Services, LLC. *Id.* ¶ 38

The Court finds these allegations sufficient to survive Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). "In a competition for sales, information about potential customers and their buying habits, a competitor's pricing, [and] business strategies . . . is a windfall, granting the recipient a key to undercut the competition's pricing . . . and attract their customers." *Albert S. Smyth Co., Inc. v. Motes*, No. CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (holding that the misappropriated information constituted trade secrets for purposes of the DTSA); *MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380, at *7 (D. Md. Oct. 1, 2010) (finding customer lists have independent economic value where company exerted resources to create lists and company's competitors could use list to undercut company's prices); *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 426 (M.D.N.C. 2015) (ruling that a customer list, "old and new product prices," and other information related to products offered to or requested by previous consumers properly constituted trade secrets, at least at the

---

[10] This information, as discussed above, was then transferred through various transaction until it reached Plaintiff Kissinger Financial Services, LLC. *See supra* § III.A. One such transfer was through the Definitive Agreement, which provides more color to what these alleged trade secrets likely include: "all customer accounts and agreements, customer lists, books and records . . ." ECF No. 46 ¶ 24.

15

pleading stage). Misappropriation of this type of information and the resulting windfall to RBC is the exact outcome that Plaintiffs allege in their Second Amended Complaint. Thus, Plaintiffs have adequately alleged that the information misappropriated has independent economic value derived from its secrecy.

Moreover, it bears emphasizing that the Plaintiffs' Second Amended Complaint deals with a misappropriation of trade secrets by the Kissingers, the founders of the investment advising business in question, and the former executives of Plaintiff Kissinger Financial Services, LLC. ECF No. 46 ¶ 18. Under these circumstances, Plaintiffs Second Amended Complaint is fairly read to include all of the valuable customer and pricing information developed/collected by the Kissingers over the sixteen years they worked for Plaintiff Kissinger Financial Services, LLC and their predecessors, including the customer and business information protected by the various employment agreements and defined in those agreements as competitively sensitive and not generally known—*e.g.*:

> business plan(s), business prospects, training materials, development plans, bidding and pricing procedures, market strategies, internal performance statistics, financial data, . . . operational and administrative plans, . . . information pertaining to actual and prospective customers, including client lists and data, client contact information and e-mail addresses, research materials or analyses, portfolio analyses, marketing materials or memoranda, correspondence, and any similar information . . . (including without limitation any of the foregoing created or developed by [E.K. and W. K.]).

ECF No. 46 ¶ 35; *see Oros, Inc. v. Dajani*, No. 1:19-cv-351 (LMB/IDD), 2019 WL 2361047, at *3 (E.D. Va. June 4, 2019). This type of information would not be generally known by competitors, but undoubtedly would be of value to them. *See Albert S. Smyth Co., Inc.*, 2018 WL 3635024, at *4 (holding that business records containing customer records and lists, customer buying habits, pricing information, vendor relationships, and business strategies constituted a

trade secret for purposes of the DTSA). Drawing all reasonable inferences in Plaintiffs' favor, this information is subject to trade secret protection under the DTSA.

### C. Sufficiency of Plaintiffs' Allegations Regarding the 2001 and 2016 Employment Agreements

Defendants argue that Plaintiffs have failed to state a claim based on the 2001 and 2016 employment agreements because Plaintiffs have only included "boilerplate recitations" that those agreements were violated and neither attach the agreements nor identify with specificity what obligations were owed under these agreements. ECF No. 51 at 14–15. Defendants support their argument by citing to *Dern v. Liberty Mut. Ins. Co.*, No. GJH-15-1737, 2015 WL 8665329 (D. Md. Dec. 11, 2015), which states that, "[i]n Maryland, a Complaint alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" 2015 WL 8665329, at *4 (emphasis in original) (quoting *RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 440 (Md. 2010)). However, *Dern* is distinguishable from the instant case.

In *Dern*, this Court found that the plaintiff had failed "to allege what contractual duty was breached" and had failed to "indicate what provision of the . . . agreement ha[d] been implicated, how Defendant's conduct breached any such provision, or what damage occurred[.]" *Id.* In contrast, the Second Amended Complaint at issue here indicates that the 2001 and 2016 employment agreements each contained non-compete, non-solicit, and confidentiality provisions similar to the non-compete, non-solicit, and confidentiality provisions included in the 2017 employment agreement and that Plaintiffs had breached these provisions. ECF No. 46 ¶¶ 19, 21–22, 26, 33, 57, 61, 67. Plaintiffs then describe the breached provisions by including block quotes laying out the exact language of the provisions as included in the 2017 agreements, *see id.* ¶¶ 32–37, and by summarizing the obligations created by each provision in the sections describing

17

Plaintiffs' breach of contract claims, *id.* ¶ 61 (describing the confidentiality provisions in the 2001 and 2016 employment agreements as prohibiting the Kissingers "from using or retaining any confidentiality, proprietary, or trade secret information"); *id.* ¶ 67 (describing the non-compete and non-solicit provisions of the 2001 and 2016 employment agreements as prohibiting "W.K. and E.K. from working for a direct competitor of Plaintiffs (RBC), from providing investment advisory, management, and/or brokerage services, soliciting Plaintiffs' clients"). Finally, Plaintiffs' Second Amended Complaint adequately describes Plaintiffs misconduct, how it breached the agreements, *id.* ¶¶ 48–52, and the resulting damages, *id.* ¶¶ 52, 58, 63–64, 69–70. Thus, Plaintiffs have sufficiently alleged that Defendants breached the 2001 and 2016 employment agreements under Maryland law.

\*\*\*

Because Plaintiffs have sufficiently pleaded that they own the right to enforce a protectable interest against the Defendants, have adequately alleged the elements of a DTSA claim, and have alleged with sufficient specificity their breach of contract claims under the 2001 and 2016 employment agreements, the Court denies the instant Motion to Dismiss.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is denied. A separate Order shall issue.

Date: <u>March   17, 2021</u>                                /s/_____
                                                            GEORGE J. HAZEL
                                                            United States District Judge